UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Michael Ratigan,<br><br>                            Plaintiff,<br><br>v.<br><br>CSX Transportation, Inc., and<br>Pan Am Railways, Inc.<br><br>                            Defendants. | Case No.: 1: 23-cv-0973 (GLS/DJS)<br><br>**COMPLAINT** |

## INTRODUCTION

1. Federal law mandates railroads routinely inspect their cars to ensure they satisfy minimum safety standards. Because railroads haul dangerous materials like vinyl chloride across the country, through neighborhoods and across wildlife refuges, their compliance with these safety standards is vital. However, railroads profit from their services, not from their safety and railroads are incentivized to comply with only the bare minimum safety requirements. Railroads are therefore also incentivized to employ inspectors that will help them avoid Federal Railroad Administration ("FRA") fines, but who will not take particular care with their responsibilities or prioritize safety over profit.

2. Michael Ratigan worked for Defendants as a carman, inspecting and repairing railcars. Ratigan understood his job was essential to keep unsafe cars from leaving the terminal and potentially derailing and causing wide-spread devastation like that in East Palestine, Ohio. Ratigan took his responsibilities seriously and always opted to spend the necessary time to properly inspect and repair cars. This brought Ratigan into direct conflict with his supervisor at CSX, who prioritized profit over safety and attempted to circumvent the minimum federal safety standards

1

and pressured the employees under him to approve cars regardless of whether they satisfied those standards. When Ratigan refused to participate in his supervisor's scheme, his supervisor fabricated an excuse to terminate Ratigan. This type of retaliation is precisely what is prohibited by the Federal Railroad Safety Act, 49 U.S.C. § 20109.

## PARTIES

3. CSX is headquartered in Jacksonville, Florida and operates trains across the eastern United States, including New York.

4. Pan Am Railways is headquartered in Billerica, Massachusetts and operates trains in the northeastern United States, including New York.

5. Ratigan resides in Melrose, New York, where he simultaneously worked for both Defendants.

## JURISDICTION AND VENUE

6. Jurisdiction is proper under 28 U.S.C. § 1331.

7. Venue is proper under 28 U.S.C. § 1391 because both CSX and Pan Am operate in this district and the illegal conduct occurred in this district.

## FACTUAL ALLEGATIONS

8. Ratigan began working for CSX in 1999 and for 23 years he worked as a carman.

9. In 2012, with CSX's knowledge, Ratigan began moonlighting as a carman for Pan Am Railways.

10. As a carman, Ratigan inspected the cars on inbound and outbound trains for safety defects and to ensure their compliance with FRA safety regulations. If he found a safety defect, he would either repair it or tag it to be moved to a car shop for repairs

11. Ratigan performed his job well for both railroads and enjoyed his responsibilities.

12. That changed when Ratigan was assigned to a new supervisor at CSX. This supervisor tried to increase the metrics CSX used to review and compensate supervisors by trying to get the employees under him to circumvent the minimum safety standards set by federal law.

13. Ratigan objected to and refused to participate in this supervisor's scheme.

14. Ratigan's supervisor was unhappy with the number of cars Ratigan ordered be taken out of service for repairs and the amount of time they were out of service for those repairs.

15. Eventually, one of the supervisor's circumventions of safety standards resulted in an investigation and fine.

16. Ratigan's supervisor blamed him for the investigation and began telling other employees that Ratigan was a "cancer."

17. Ratigan confronted the supervisor, who told Ratigan that he needed to "get on board" with the supervisor's plan to speed up inspections and not take cars out of service for repairs.

18. Ratigan told his supervisor that there were no grey areas when it came to car inspections, that he would continue to take cars that failed inspection out of service for repairs, and that he would not otherwise comply with the supervisor's illegal and dangerous scheme.

19. Shortly thereafter, CSX caught two employees trying to steal a piece of equipment.

20. There was initially reason to believe that Ratigan may have participated in the attempted theft.

21. CSX's investigation into the incident, however, made it clear that Ratigan was not involved in the attempted theft.

22. The supervisor nevertheless charged Ratigan with a workplace rule violation, for

which CSX terminated him.[1]

23. Unsatisfied, Ratigan's supervisor also informed a Pan Am supervisor of Ratigan's alleged workplace violation, pressuring Pan Am to also discipline Ratigan.

24. Pan Am then investigated and terminated Ratigan, again despite it having no reasonable basis to believe Ratigan participated in any dishonest or illegal conduct.

25. Simply because Ratigan did the right thing, performed his job well and refused to join or comply with his supervisor's scheme, he lost his career with Defendants.

26. Ratigan therefore filed a claim with the Department of Labor, alleging his terminations violated the Federal Railroad Safety Act, 49 U.S.C. § 20109.

## CAUSES OF ACTION

### Violations of 49 U.S.C. § 20109

27. The FRSA prohibits railroad carriers from retaliating against employees for engaging in protected activity.

28. Protected activity includes "provid[ing] information, directly caus[ing] information to be provided, or otherwise directly assist[ing] in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security…" 49 U.S.C. § 20109(a)(1).

29. Protected activity also includes "refus[ing] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security[.]" 49 U.S.C. § 20109(a)(2).

30. Protected activity also includes "reporting, in good faith, a hazardous safety or

---

[1] Pursuant to his union's collective bargaining agreements with Defendants, Ratigan had a right to an internal hearing before he could be terminated. The hearings, however, are more of a procedural than a substantive hurdle to discipline. Thus, charging an employee with a workplace rule violation is, for all intents and purposes, is tantamount to making the discipline decision.

4

security condition..." 49 U.S.C. § 20109(b)(1)(A).

31. The FRSA also protects employees who refuse to work when confronted by a hazardous condition relates to the performance of the employee's duties and/or refusing to authorize the use of any safety-related equipment if the employee is responsible for the inspection or repair of the equipment when the employee believes the equipment is in a hazardous safety condition. *See* 49 U.S.C. § 20109(b)(1)(B)-(C).

32. Ratigan engaged in protected activity every time he reported to Defendants that a car needed to be repaired; objected to his supervisor's efforts to circumvent the federal regulations setting minimum safety standards for cars and/or otherwise authorize cars that were not safe for use to nevertheless be used; and/or otherwise refused to participate in his supervisor's illegal and immoral scheme.

33. Defendants took adverse actions against Ratigan when they charged him with a workplace rule violation and then terminated him.

34. Defendants knew Ratigan had engaged in protected activity when they took these adverse actions against him.

35. Ratigan's protected activity was a contributing factor in Defendants' decision to take the above-referenced adverse actions against him. In fact, the adverse actions against Ratigan resulted directly from his protected activity.

### REQUEST FOR RELIEF

36. Ratigan requests that the Court find Defendants acted in direct violation of the FRSA.

37. Ratigan further requests that the Court order Defendants to:

- reinstate him to the same position he held when he was terminated;

- clear and/or expunge any record of misconduct by him regarding his alleged theft;

- pay to him an award for compensatory damages arising from loss of income and benefits in an amount to be determined by the trier of fact;

- pay to him an award for emotional distress in an amount to be determined by the trier of fact;

- pay to him an award for costs (including litigation and expert costs), disbursements, and attorneys' fees; and

- pay to him an award for $250,000 for punitive damages.

38. Ratigan further requests that the Court order judgment against Defendants for all other relief available under the FRSA and such other relief as the Court deems just and equitable.

Dated: August 10, 2023

**COUNSEL FOR PLAINTIFF**

*John W. Bailey*

John W. Bailey,
Bailey, Johnson & Peck, P.C.
5 Pine West Plaza, Suite 507
Albany, New York 12205
Phone: (518) 456-0082
Email: jwbailey@baileyjohnson.com


Nicholas D. Thompson, WI 1079903
*Pro Hac Vice Forthcoming*
Casey Jones Law
3520 Cherryvale Avenue, Suite 83
Appleton, WI 54913
Phone: (757) 477-0991
Email: nthompson@caseyjones.law

6