**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MICHAEL RATIGAN,

                    Plaintiff,

    v.

CSX TRANSPORTATION, INC., PAN AM
RAILWAYS, INC.,

                  Defendants.

1:23-cv-973
(ECC/PJE)

---

APPEARANCES:

John W. Bailey, Esq., *for Plaintiff*
Kathleen McCaffrey Baynes, Esq., *for Defendants*

**Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION & ORDER**

Plaintiff Michael Ratigan brought this action against Defendants CSX Transportation, Inc. (CSX) and Pan Am Railways, Inc. (Pan Am) alleging that they retaliated against him in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20109. Dkt. No. 1. Presently before the Court is Defendants' motion for summary judgment,. Dkt. No. 36. The motion is fully briefed. Dkt. Nos. 36, 40, 41. For the following reasons, Defendants' motion for summary judgment is granted.

**I.  Background[1]**

In  2022, Plaintiff Michael Ratigan worked for CSX and Pan Am as a lead carman. Pl. Resp. Def. SUMF ¶¶ 1-2, 183.  He had been a railroader since 1998 and worked in the railroad

---

[1] The facts are drawn from Defendants' Statement of Material Facts (Def. SUMF), Dkt. No. 36-7, and Plaintiff's Response to Defendants' Statement of Material Facts and Additional Material Facts (Pl. Resp. Def. SUMF), Dkt. No. 40-1, and the exhibits that the parties have submitted, to the extent that they are admissible evidence.  Disputed facts are noted.

industry for approximately twenty-four years.  *Id.*  He inspected railcars before they were placed on the rails and identified cars that needed repairs as "crippled" or a "bad order."  Pl. Resp. Def. SUMF ¶¶ 1-6.  Rail car maintenance and repair is governed by federal regulations.  *Id.* ¶ 5.  The parties dispute whether CSX set its own inspection protocol, and whether the CSX rail car inspection protocol fully complied with all applicable federal and state regulations.  *Id.* at ¶¶ 5, 277.

In 2022, Shane Adkins was the Northeast Region Zone Mechanical Superintendent for CSX at Selkirk Yard, and a supervisor of Plaintiff's CSX team with two levels of management between Adkins and approximately 150 carmen.  *Id.* ¶ 275, 279-80.  According to Plaintiff, (1) Adkins believed that the number of bad orders was too high, Ratigan Deposition (Ratigan Dep.), Dkt. No. 36-24 at 35-37,[2] (2) "Adkins and his subordinate managers began pressuring carmen to speed up . . . inspections and overlook defects," Declaration of Jeremy Walker (Walker Decl.), Dkt. No. 40-4 ¶ 7; (3) Adkins instructed carmen to only inspect the first six[3] feet of a car instead of the entire length of the car, Ratigan Dep. at 22-27, and (4) Adkins told "[e]very manager that was on duty" that they had to look at a car before it could "go into bad order status," and it was the manager's decision whether they were a bad order or not," Ratigan Dep. at 38-39.  Adkins denies that he was aware that Plaintiff alleged that he and other managers were pressuring carmen, including Plaintiff, not to tag defects or that anyone ever brought to his attention that union-level employees thought that the on-duty managers were releasing cars that should not have been.  Adkins Deposition (Adkins Dep.), Dkt. No. 36-31 at 67-68.

---

[2] Citations to page numbers refer to the ECF pagination unless otherwise noted.

[3] The instruction to only inspect the first several feet of the cars was alternatively described as a four-foot rule.  Walker Decl. ¶ 8.

Plaintiff "insisted on performing full inspections and bad ordering cars."  Pl. Resp. Def.

SUMF ¶ 49.  At safety meetings with management, Plaintiff "was extremely vocal" about how the

carmen "were not being allotted enough time to do inspections" and "need to be able to bad order

shop defective cars as needed." Walker Decl. ¶ 10.  The parties disagree about whether Adkins was

present for any of these meetings.  *Compare* Declaration of Michael Ratigan (Ratigan Decl.), Dkt.

No. 40-12 ¶ 12 *with* Defendants' Reply (Def. Reply), Dkt. No. 41 at 4.  Plaintiff claims that two

other CSX supervisors, Mort Stimers and Tom Gallagher, were also aware of Plaintiff's bad orders

and comments at safety meetings.  Pl. Dep. at 59-60, 77-78.

The parties also disagree about whether Adkins described Plaintiff as a "cancer," because

his positions might spread to other carmen, although Adkins admits that someone at CSX used that

term. Pl. Resp. Def. SUMF ¶ 49; Ratigan Dep. at 52-53; Adkins Dep. at 28-29.  According to

Plaintiff, Plaintiff talked to Adkins about calling him a cancer, and Adkins responded that "he was

not happy with" (1) Plaintiff's inspections and performance, (2) "second shift and the way second

shift was inspecting cars," and (3) "the number of bad order cars."  Ratigan Dep. at 53-56.  Adkins

"is not real sure of the entire conversation, but" described it as "very cordial."  Adkins Dep. at 29-

30.

On April 20, 2022,[4] approximately one week after this conversation, CSX employees

notified a CSX supervisor that a welder was missing.  Pl. Resp. Def. SUMF ¶ 19; Ratigan Dep. at

58.  After watching a security video, CSX supervisors determined that Troy Conklin, Benjamin

Crewel, and Plaintiff were involved in the theft of the missing welder.  Pl. Resp. Def. SUMF ¶ 25.

The video shows the welder was taken to the employee parking lot, placed in Plaintiff's personal

---

[4] The parties disagree about the date that the welder was taken.  *Compare* Def. SUMF ¶¶ 19, 34
(April 21, 2022) *with* Pl. Resp. Def. SUMF at ¶¶ 19, 34 (April 20, 2022).   Evidence in the record
supports the dates asserted by Plaintiff.  Dkt. Nos. 40-6, 40-8.

vehicle, and Plaintiff left with the welder in his vehicle. Pl. Resp. Def. SUMF ¶¶ 19, 23-31. The welder had a prominent logo on its side and a barcode sticker indicating that it was CSX property. Def. SUMF ¶¶ 71-76. The parties dispute whether the welder was in a bag when it was placed in Plaintiff's vehicle. *Id*. at ¶ 77. CSX did not give Plaintiff permission to remove the welder. Def. SUMF ¶ 10. Plaintiff denies that he was involved in any theft, Pl. Resp. Def. SUMF ¶¶ 10, 71.

Based on the video, a CSX supervisor, George Roberts, determined that Conklin, Crewell, and Plaintiff were involved in the theft. *Id.* ¶¶ 19, 25. After reviewing the videos, CSX supervisors brought Conklin and Crewell into a supervisor's office where they completed statements and were then informed that they were removed from service. *Id.* ¶ 33, 41. CSX did not give Plaintiff an opportunity to make a statement or tell him that he was being removed from service. *Id.* ¶ 41.

CSX charged Conklin, Crewell, and Plaintiff with the same Operating Rules violation charges, and Adkins was the charging officer for charges against all three employees. *Id.* ¶¶ 43, 47-49. One of the CSX employees involved in the theft asked if the charges could be withdrawn if the welder was returned. *Id.* ¶ 95. The following day, Crewell stated that the welder could be returned in 30 to 45 minutes, and CSX found the welder on its property in a plastic bag. *Id.* ¶¶ 34, 40, 77, 160. CSX gave Plaintiff, Crewell, and Conklin an opportunity to resign before a hearing. *Id.* ¶¶ 44-45. Crewell and Conklin resigned, but Plaintiff did not. *Id.* ¶ 54.

A CSX employee who steals is subject to dismissal, and, unlike less serious violations, managers have no discretion when the violation involves stealing. Pl. Resp. Def. SUMF ¶¶ 172-74. CSX employees charged with theft either resign or have been dismissed. *Id.* ¶177; Dkt. No. 36-19 at 239-43.

A CSX general foreman, Paul Douglas Hall, was the hearing officer for Plaintiff's "investigational" hearing. Pl. Resp. Def. SUMF ¶ 79. Hall watched the video and heard testimony

from Plaintiff, Adkins, and other CSX supervisors.  Dkt. No. 36-8 at 2; Dkt. No. 36-29 at 19.

Plaintiff alleges that the hearing was not a neutral forum.  Pl. Resp. Def. SUMF ¶ 84.  Hall did not

believe Plaintiff's hearing testimony because, among other reasons, (1) either Crewell or Conklin

asked if the charges could be dismissed if the welder was returned, (2) the video showed that the

welder was placed in Plaintiff's car, and (3) Plaintiff had left his car open.  *Id.* at ¶¶ 94-97.  Hall

also found that Plaintiff was involved in the theft and recommended dismissal.  *Id.* ¶¶ 103, 108.

The Chief Assistant Mechanical Officer approved Plaintiff's dismissal based on his conclusion

that Plaintiff was involved in the theft, and the welder was in Plaintiff's car.  *Id.* ¶¶ 112, 114-15,

126.

On June 1, 2022, CSX "purchased" Pan Am, and employee disciplinary matters related to

events that occurred before the purchase were handled separately for CSX and Pan Am.  Pl. Resp.

Def. SUMF ¶ 193; Adkins Dep. at 52.  Adkins did not have any direct control over Pan Am, which

maintained its own policies during the relevant period of time for the dispute.  Adkins Dep. at 51-

53.

When Plaintiff was removed from service at CSX, he told his Pan Am bosses about the

situation, and they assured him that they were not worried about any discipline at CSX.  Pl. Resp.

Def. SUMF ¶ 298.  On June 3,  2022, Adkins, who was working for CSX, and Ratigan, who was

working for Pan Am, were at a train derailment.  Pl. Resp. Def. SUMF ¶ 204; Adkins Dep. at 52.

A day or two later, Adkins called "two bosses above" Plaintiff's Pan Am boss and said that Pan

Am should take Plaintiff out of service.  Ratigan Dep. at 80-81.  Approximately two days after the

derailment, Plaintiff's "boss's boss" called him and said that Adkins "called from CSX" and said

that Plaintiff "was to be taken out of service immediately at Pan Am . . . for something that

happened at CSX in Selkirk months before."  *Id.* at 81.  Pan Am conducted its own investigation

of whether Plaintiff violated its safety rules.  Pl. Resp. Def. SUMF ¶ 194.  According to Plaintiff,

Pan Am merely obtained the video and asked Adkins to repeat his testimony.  *Id*.  The Pan Am

hearing officer concluded that Plaintiff had violated its rules and recommended discipline.  *Id.* at

¶ 209-23.  According to Plaintiff, his Pan Am bosses attended the Pan Am hearing and told him

during a break, "This is just bullshit, and this has nothing to do with us.  Why is this even going

on?"  Ratigan Dep. at 86.  Pan Am terminated Plaintiff.  *Id.* ¶ 243.

## II.    Legal Standard

Summary judgment may be granted only if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing

law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see*

*also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may

meet this burden by showing that the nonmoving party has "'fail[ed] to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth*., 711 F.3d 253,

256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party

has "'failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict

in his or her favor on' an essential element of a claim") (quoting *In re Omnicom Grp., Inc. Sec.*

*Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)). If the moving party meets this burden, the nonmoving

party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477

U.S. at 248, 250; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  In ruling on a motion

for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess

whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.

2011) (quoting *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in

the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775,

780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255).  Still, the nonmoving party "must do more

than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation

or conjecture as to the true nature of the facts to overcome a motion for summary judgment,"

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*,

758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . .

cannot by themselves create a genuine issue of material fact where none would otherwise exist."

*Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451,

1456 (2d Cir. 1995)).

## III.    Discussion

Defendants argue that summary judgment is appropriate because there are no genuine

issues of material fact for any of the elements necessary to establish a prima facie case of retaliation

or, in the alternative, the same action defense applies as a matter of law.  Plaintiff responds that

there are genuine issues of disputed material fact precluding summary judgment.  For the following

reasons, Pan Am's motion for summary judgment is granted because there is insufficient evidence

that Pan Am was aware of any protected activity, and CSX's motion for summary judgment is granted based on the same act defense.

### A. Prima Facie Retaliation

To make out a prima facie case of retaliation under the Federal Railroad Safety Act (FRSA), a plaintiff must establish by a preponderance of the evidence the following four elements: "(1) the plaintiff engaged in protected activity; (2) the employer knew that the plaintiff engaged in the protected activity; (3) the plaintiff suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Stever v. CSX Transportation, Inc.*, No. 5:20-cv-1467 (GTS), 2023 WL 8806203 at *30 (N.D.N.Y. Dec. 20, 2023) (quoting *Tompkins v. Metro-North Commuter R.R. Co.*, 983 F.3d 74, 80 (2d Cir. 2020)). "If the employee satisfies these requirements, 'then the burden shifts to the employer to demonstrate by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity.'" *Lockhart v. MTA Long Island R.R.*, 949 F.3d 75, 79 (2d Cir. 2020) (quoting *Conrad v. CSX Transpr., Inc.,* 824 F.3d 103, 107 (4th Cir. 2016)).

The parties do not dispute that Plaintiff experienced an unfavorable personnel action. Defendant's Memorandum of Law (Def. MOL) at 15, Dkt. No. 36-35; Plaintiff's Response to Defendant's Memorandum of Law (Pl. Resp.) at 22, Dkt. No. 40. The first element is therefore satisfied.

As to whether Plaintiff engaged in protected activity, Defendant argues that Plaintiff did not identify any legal or internal standard that Defendant violated and Plaintiff complained about. Def. MOL at 11-13. Plaintiff responds that that he "reported a hazardous safety condition every time he bad ordered a car with a defect." Pl. Resp. at 18-19, Dkt. No. 40.

Protected activity under FRSA includes "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A). "A railroad employee engages in protected activity under § 20109(b)(1)(A) when she reports what she subjectively believes to be a hazardous safety or security condition irrespective of whether that understanding is objectively reasonable." *Ziparo v. CSX Transportation, Inc.*, 15 F.4th 153, 163 (2d Cir. 2021). Protected activity under FRSA also includes refusal "to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security." 49 U.S.C. § 20109(a)(2). This provision protects both actual violations of federal law and actions that the employee believes in good faith to be violations of federal law. *Rookaird v. BNSF Ry. Co.*, 908 F. 3d 451, 457 (9th Cir. 2018). Finally, protected activity under FRSA includes "provid[ing] information, directly caus[ing] information to be provided, or otherwise directly assist[ing] in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security" to any "Federal, State, or local regulatory or law enforcement agency." 49 U.S.C. § 20109(a)(1)(A).

Here, viewing the evidence in the light most favorable to Plaintiff, he has raised a genuine dispute of material fact as to (1) whether he engaged in protected activity when he bad ordered a car for safety hazards; and (2) whether Plaintiff engaged in protected activity when he expressed his safety concerns about Adkin's alleged new car inspection procedures, at meetings with supervisors, when the procedures were explained to carmen. Ratigan Dep. at 62. In addition, viewing the evidence in the light most favorable to Plaintiff, a jury could find that Plaintiff subjectively believed that placing uninspected cars on the rails as a result of the procedures Adkins allegedly implemented could be dangerous, *id.* at 24-27, and that under these circumstances when Plaintiff bad ordered a car because of a safety hazard, that was protected activity.

9

Viewing the evidence in the light most favorable to Plaintiff, he has also raised a genuine question of material fact as to whether he had a reasonable belief that the instructions to inspect cars more quickly and only inspect the six feet between cars violated federal railroad safety regulations. Pl. Resp. Def. SUMF ¶ 5. Finally, viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether Adkins knew that Plaintiff participated in the FRA/NYS DOT investigation, and a reasonable jury could conclude that Plaintiff's participation in any such investigations involving rule violations at Selkirk Yard was protected activity under FRSA. Pl. Resp. Def. SUMF ¶ ¶ 55-60.

As to whether any of the CSX supervisors involved in the disciplinary process were aware of Plaintiff's protected activity, viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact about whether Adkins and other supervisors were aware of Plaintiff's concerns because of the evidence that Plaintiff expressed his concerns when Adkins and other supervisors were present. Pl. Dep. at 37-38; Pl. Resp. at 16-17; Ratigan Decl. ¶ 2. In addition, Plaintiff has produced evidence that he talked to Adkins about calling Plaintiff a cancer, and Adkins stated that he was not happy with Plaintiff's refusal to "get on board." Ratigan Dep. at 53-56; Adkins Dep. at 29-30. Based on this evidence, a jury could reasonably conclude that Adkins was aware of Plaintiff's protected refusal to comply with new inspection protocols.

A jury could also conclude that two other CSX supervisors, Gallagher and Stimer, were aware of Plaintiff's protected activity because Plaintiff produced evidence that Gallagher and Stimer were present at safety meetings when he expressed his safety concerns about the alleged new procedures. Pl. Dep. at 59-60. Plaintiff also produced evidence that they were aware of "when [Plaintiff] would come in with cars that were in bad order status" and, at different times, described Plaintiff as a "thorn in their side." Pl. Dep. at 77-78.

10

Regarding Pan Am, Plaintiff does not argue that he engaged in any protected activity at Pan Am.  Pl. Resp. at 12-13, 28.  In addition, Plaintiff has not provided any evidence that Pan Am was aware of Plaintiff's protected activity at CSX or that the relationship between the companies at the relevant time supports an inference that Pan Am was aware of Plaintiff's protected activity at CSX.

To establish that Pan Am was aware Plaintiff's allegedly protected activity at CSX, Plaintiff relies on a "cat's paw" theory.  Pl. Resp. at 20.  That theory allows knowledge to be imputed to an employer when a person with discriminatory motive, the "bad actor," facilitates a different decision-maker in the organization to engage in an adverse employment action against the plaintiff, even when the decision-maker lacks the requisite knowledge.  The cases relied on by Plaintiff involve circumstances where the bad actor and the decision-maker are within the same organization, and liability is imputed to the shared employer.  *See Lowery v. CSX Transportation, Inc.,* 690 F. App'x 98, 100 (4th Cir. 2017) (accepting theory where supervisor "advised" decision makers about whether the plaintiff had made a false statement); *see also Niedziejko v. Delaware & Hudson Ry. Co.*, 18-cv-0675 (GTS), 2019 WL 1386047 at *41-42 (N.D.N.Y. Mar. 27, 2019) (explaining that the theory generally "involve[s] the supervisor advising the decision-maker or being intimately involved in the decision) (citing *Lowery,* 690 F. App'x at 100; *Johnston v. BNSF Ry. Co.*, 2017 WL 4685012, at *8 (D. Minn. Oct. 16, 2017) (applying theory where supervisors were "intimately involved" in the decision); *Staub v. Proctor Hosp.*, 562 U.S. 411, 421-22 (2011) (discussing the rationale underlying the cat's paw theory of employer liability in the context of USERRA).  Unlike those cases, Plaintiff is attempting to impute knowledge to a distinct entity, Pan Am, even though Pan Am did not employ the alleged bad actor, Adkins.  *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271-275 (2d Cir. 2016) (discussing the cat's paw

theory for Title VII liability, emphasizing that the theory imputes knowledge to the bad actor's

employer).  Although the cat's paw theory would allow knowledge to be imputed to CSX and its

decision makers as Adkins's employer, the theory does not support imputing knowledge to Pan

Am here, because Plaintiff has not produced any evidence that Pan Am employed Adkins.  Plaintiff

has also not provided any authority for applying the cat's paw theory to these circumstances.

Given the lack of evidence that Pan Am had any knowledge of Plaintiff's protected activity at

CSX, Pan Am is entitled to summary judgment.

Regarding causation, Defendant argues that Plaintiff cannot show that retaliation was a

contributing factor.  Def. MOL at 11-12.  Plaintiff responds that his circumstantial evidence is

sufficient because whistleblowers are not required to show intentional retaliation.  Pl. Resp. at 18-

21.  There is a genuine disputed issue of a material fact regarding causation.

"To establish that retaliation was a contributing factor, an FRSA plaintiff must produce

evidence of 'intentional retaliation prompted by the employee engaging in protected activity.'"

*Tompkins*, 983 F.3d at 82 (quoting *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663

(S.D.N.Y. 2017) (additional quotation omitted)).  However, "[t]he plaintiff need not show that the

'contributing factor' was the sole factor affecting the discipline or that the employer acted only

with retaliatory motive."  *Id*. (quoting *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir.

2018)).  "The plaintiff must, however, show 'more than a temporal connection between the

protected conduct and the adverse employment action . . . to present a genuine factual issue on

retaliation.'"  *Id*. (quoting *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014) (cleaned up)).

In *Tompkins*, the Second Circuit considered the following factors:

(1) whether and to what extent the disciplinary measures were related to the
protected activity, (2) the temporal relationship between the protected activity and
the disciplinary measures, including whether any intervening incidents occurred
that could independently justify the discipline, (3) whether the disciplined

employee was represented by counsel or a similar representative in the disciplinary proceedings, and whether the disciplinary measures were upheld on appeal, (4) whether, if applicable, the disciplinary measures were upheld following Department of Labor proceedings, and (5) whether the persons accused of hostility towards the employee's protected activity participated in the disciplinary decision.

983 F.3d at 82-83.[5]

Although CSX terminated Plaintiff because of the theft, Plaintiff argues that this was a pretext to retaliate for his protected activity. Pl. Resp. Def. SUMF ¶ 49; Pl. Resp. at 26-28. Viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact about whether retaliation was a contributing factor given the evidence that Adkins had a retaliatory motive including his involvement in investigating and pursuing the theft charge which was brought approximately one week after Plaintiff asked Adkins why he called Plaintiff a "cancer." Pl. Resp. Def. SUMF ¶ 49.

**B.  Same Action Defense**

CSX argues that it has demonstrated by clear and convincing evidence that it would have terminated Plaintiff based on the theft "regardless of the protected activity." Def. MOL at 18-22. Plaintiff responds that Defendants have not provided a relevant comparator who was "terminated for theft when there was exculpatory evidence." Pl. Resp. at 28-30.

Here, the video shows someone put the welder in Plaintiff's car, and Plaintiff admits that there "was initially reason to believe that [Plaintiff] may have participated in the alleged theft." Dkt. No. 36-15; Pl. Resp. Def. SUMF ¶¶ 38, 75-78, 159-60; Compl. ¶ 20.  In addition, Plaintiff has not produced evidence that Adkins was consulted before a CSX supervisor made the initial

---

[5] Plaintiff argues that the Supreme Court overturned the *Tompkins* intentionality requirement in *Murray v. UBS Securities, LLC*, 601 U.S. 23 (2024), and that he therefore only needs to demonstrate that his protected activity contributed in some way to the adverse action. Pl. Resp. at 23-24.  The causation prong is satisfied regardless of intentionality, and the Court therefore does not need to decide this issue.

determination that Plaintiff was involved in the theft.  Instead, even viewing the evidence in the light most favorable to Plaintiff, CSX supervisor Roberts made the initial determination based on the security video, and the investigation began after Gallagher also reviewed the security video. Pl. Resp. Def. SUMF ¶¶ 23-31.

Furthermore, the CSX hearing officer found "it hard to believe that [Plaintiff] didn't know [the welder] was CSX property" and "that he would leave another employee's personal item on the side of a road for several days."  Dkt. No. 36-30 at 26-27; Pl. Resp. Def. SUMF  ¶¶ 127, 128, 133.  The CSX hearing officer also testified that an employee is subject to dismissal for stealing, that "when it comes to . . . stealing . . . there's no . . . leeway in that."  Dkt. No. 36-30 at 9.  Finally, the CSX hearing officer testified that he did not "know of any instance where we offered somebody a waiver for theft.  It's usually dismissal or they resign."  Dkt. No. 36-30 at 36.  Defendants also provided evidence that CSX routinely dismisses or requests the resignation of employees charged with theft.  Dkt. No. 36-19 at 239-43.

Even viewing the evidence in the light most favorable to Plaintiff, this is clear and convincing evidence that (1) CSX had an independent basis to initiate an investigation and to charge Plaintiff with theft, (2) supervisors other than Adkins and a hearing officer found that Plaintiff's version of events was not credible, and (3) CSX regularly dismisses employees charged with theft.  CSX has therefore demonstrated by clear and convincing evidence that it would have taken the same personnel action in the absence of Plaintiff's protected activity.  *See Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1102 (D. Minn. 2013), *aff'd*, 768 F.3d 786 (8th Cir. 2014) (concluding that there was clear and convincing evidence that defendant would have terminated Plaintiff's employment even with no evidence of protected activity where the decision to terminate after Plaintiff's "second serious rule violation within a twelve month period" was consistent with

14

the company's "policies and past practices" and the company's "uncontroverted evidence" reflected "a consistent and neutral application of [its] disciplinary policies and procedures."); s*ee also Stever*, 2023 WL 8806203 at \*39-40 (discussing *Kuduk* factors).  Accordingly, the portion of the motion seeking summary judgment for CSX is granted, and the Complaint as against CSX is dismissed.

## IV.    Conclusion

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment under Rule 56, Dkt. No. 36, is **GRANTED** as to Defendants CSX and Pan Am, and it is further

**ORDERED** that the Clerk of the Court is directed to close out the case.

**IT IS SO ORDERED.**

Dated: September 30, 2025

Elizabeth C. Coombe
U.S. District Judge